## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## BEAUFORT DIVISION

|  |  |  |
|---|---|---|
| LUMUMBA KENYATTA INCUMAA, *a/k/a* Theodore Harrison, Jr., | ) ) ) | |
| Plaintiff, | ) ) | No. 9:17-cv-01608-DCN |
| vs. | ) ) ) | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| BRYAN P. STIRLING, SANDRA BARRETT, and BARTON VINCENT, | ) ) ) | |
| Defendants. | ) ) ) | |

The following matter is before the court on plaintiff Lumumba Kenyatta Incumaa's ("Incumaa") complaint against defendant Bryan P. Stirling ("Director Stirling"), the director of the South Carolina Department of Corrections ("SCDC"). ECF No. 1, Compl.; ECF No. 46.[1]  For the reasons set forth below, the court finds in favor of the plaintiff.

## I.   PROCEDURAL HISTORY

Incumaa, a prisoner in the custody of SCDC, brings this case to challenge various SCDC policies concerning religion.  On June 19, 2017, Incumaa filed a verified complaint against defendants alleging violations of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, et seq., and the First Amendment to the United States Constitution, U.S. Const. amend I.  ECF No. 1, Compl. He alleges that he is an adherent of the God Centered Culture that is the Nation of Gods

---

[1] By virtue of the court's March 19, 2019 order granting partial summary judgment, Stirling is the only remaining defendant in this case.  See ECF No. 46 at 2.

and Earths ("NGE") and that SCDC refuses to recognize or accommodate his faith. Id. § IV.D.

Originally, he specifically contended that defendants violated RLUIPA by (1) prohibiting him from exercising NGE individually in the prison's general population, (2) prohibiting him from exercising NGE in groups with other prisoners in the general population, (3) prohibiting him from possessing various NGE texts and materials, (4) prohibiting him from receiving services provided by NGE volunteers, (5) prohibiting him from purchasing and wearing a crown, (6) prohibiting the accommodation and observance of various NGE holy days, and (7) prohibiting him from receiving meals in accordance with NGE dietary restrictions. Id. He also contended that defendants were restricting him from receiving Five Percenter magazine. Id.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule 73.02(B)(2), the court assigned this matter to Magistrate Judge Bristow Marchant for pretrial proceedings. On March 23, 2018, defendants filed a motion for summary judgment, ECF No. 29, and on August 23, 2018, Magistrate Judge Marchant issued a report and recommendation ("R&R"), recommending that the court grant summary judgment in favor of defendants in part, ECF No. 39, R&R. The court adopted the R&R on March 19, 2019, granting summary judgment with respect to Incumaa's request for monetary damages and his claims relating to his receipt of the Five Percenters newspaper, his wearing of religious headgear, his right to dietary options that comply with NGE restrictions, and his right to receive services from NGE volunteers. ECF No. 46. The court denied summary judgment with respect to Incumaa's claim that Stirling's refusal to recognize NGE as a religion violates his rights under RLUIPA. Id. As a result, there are two issues pending

2

before the court in this trial. The first is whether Incumaa properly exhausted his RLUIPA claim, and the second is whether SCDC must recognize NGE.

On May 13, 2024, the court held a bench trial, during which the court received exhibits and heard from witnesses. ECF No. 92; see also ECF Nos. 93 (Incumaa's witness list); 94, Tr. (trial transcript). Because one of the witnesses was unavailable for trial, the parties agreed that this witness's deposition testimony could be submitted into the record. Tr. 169:9–25. Accordingly, Incumaa filed that witness's deposition on August 15, 2024. ECF Nos. 95; 96.

Having considered the testimony and exhibits admitted at trial, as well as the additional witness deposition, the parties' pre-trial briefs, and the parties' post-trial written closing arguments and proposed findings and conclusions, the court now makes the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

## II.  FINDINGS OF FACT[2]

### A. Origins and Beliefs of NGE

1. The court heard testimony from Dr. Michael Knight ("Dr. Knight"), who was admitted without objection as an expert on NGE. Tr. 109:7–11.

2. Dr. Knight is a graduate of Skidmore College, received a master's degree from Harvard Divinity School, and obtained a Ph. D. from U.N.C. Chapel Hill. Tr. 103:14–104:18. He is currently an associate professor at the University of Central Florida. Tr. 106:18–107:2. Dr. Knight studies world

---

[2] These findings are based on the preponderance of the evidence presented to the court.

3

religions, how they develop and change over time, and teaches courses in world religions. Tr. 103:14–109:6. He has written books, presented at seminars, lectures, and specifically has taken a professional interest in NGE. Tr. 107:8–109:6.

3. According to Dr. Knight, NGE originated as on offshoot of the Nation of Islam ("NOI") before becoming a distinct tradition. Tr. 111:17–113:12, 121:18–122:4, 125:12–126:1, 127:14–128:18.

4. NOI emerged in the early 20th century in the United States. Tr. 127:14–19.

5. In contrast with classical Islam, which teaches that there is one transcendent deity who is God, NOI venerates one man, Fard Muhammad, as "Supreme Allah." Tr. 112:6–17.

6. The Supreme Wisdom Lessons are texts used to educate new NOI members. Tr. 123:13–15. The Supreme Wisdom Lessons refer to the five, the ten, and the eighty-five. Tr. 123:15–16. According to this tradition, the eighty-five percent are "the deaf, dumb, and blind" who believe in God as something outside of themselves. Tr. 123:17–20. This includes Christians and Muslims. Tr. 123:21–24. The ten percent are the elites who exploit and oppress the eighty-five percent by preaching the existence of an external God to keep the masses in line. Tr. 123:25–124:9. The five percent are those who recognize themselves as god. Tr. 124:10–16. The NOI understands itself as this five percent. Tr. 124:15–16.

7. Fard Muhammad disappeared in the 1930's, and by the 1960's, Elijah Muhammad was the leader of NOI and continued to regard Fard Muhammad as "Supreme Allah." Tr. 112:11–25, 124:17–125:5.

8. According to tradition, Clarence 13X was a follower of NOI, who became disillusioned with NOI's teachings. Tr. 112:6–25, 124:17–125:4. Clarence 13X came to the belief that Elijah Muhammad's leadership and hierarchy in NOI was at odds with the teachings in the Supreme Wisdom Lessons. Tr. 112:11–25. In particular, Clarence 13X viewed Elijah Muhammad's regarding Fard Muhamad as Supreme Allah as a form of associating with an unseen god. Tr. 112:11–25, 124:17–125:4. Clarence 13X's understanding of the Supreme Wisdom Lessons was that the black man was god in a general sense and not in the sense of his being associated with an unseen, supernatural entity. Tr. 112:11–25, 124:17–125:11.

9. As a result, Clarence 13X broke off from NOI and changed his name to Allah the Father. Tr. 112:20–113:11, 127:14–128:18, 148:10–14.

10. Those who saw themselves as Allah thus became known as Five Percenters because they regard themselves as being five percent within the five percent. Tr. 125:5–10. Eventually, their movement was renamed the Nation of Gods and Earths in the 1980's. Tr. 125:12–13.

5

11. The adherents of NGE do not believe in a supernatural entity, and they do not pray to a god.  Tr. 113:8–15.  Rather, NGE teaches that each black man is his own god.[3]  Tr. 113:19–21, 120:2–8.

12. In addition to believing all black men are gods, the Supreme Wisdom Lessons also identify white men as being devils.  Tr. 155:11–20.  However, NGE adherents do not believe in the devil in the sense of a supernatural entity.  Tr. 165:8–14.  Dr. Knight testified that, according to NGE tradition, Allah the Father had a white student named Azreal, with whom Allah the Father spent more one-on-one time than any of his other students, and Dr. Knight explained that Allah the Father once proclaimed that the devil is not a race and is instead the mentality of white supremacy.  Tr. 165:8–167:9.

13. NGE adherents believe they can go through the process of "achieving, recognizing, [and] affirming their own godhood" by using the Supreme Alphabets and the Supreme Mathematics.  Tr. 113:19–22.

14. The Supreme Alphabets and Supreme Mathematics assign attributes to letters and numbers.  Tr. 114:1–115:16.  NGE adherents use these "technologies" to extract meaning on a particular topic from the Lessons.  Tr. 114:1–115:16.  This process involves NGE adherents studying the Supreme Alphabets, Supreme Mathematics, and Supreme Wisdom Lessons on a daily basis to

---

[3] According to Dr. Knight, there is some disagreement among NGE adherents over whether women or white people can be gods.  Tr. 141:13–18.  However, he conceded that the idea of a white person being a god is "an unpopular opinion."  Tr. 141:17–18.

learn how to use their creative power to "make meaning in the world" and how to "live out their reality as god."  Tr. 120:2–22.

15. Many NGE adherents also have dietary restrictions, and while different adherents have disagreements on what those restrictions are, most if not all agree that pork is forbidden.  Tr. 120:23–121:5, 143:21–144:6.

16. NGE adherents assemble together in a practice called "parliament," during which they take turns discussing their understanding of the day's mathematics or degree.  Tr. 121:6–17.

17. Some NGE adherents have been known to attend Muslim Jumu'ah services and to study the Qur'an, as well as the Bible.  Tr. 147:7–12, 152:22–154:4.  However, the idea of venerating oneself as a god, and referring to oneself as Allah, would be "the grossest heresy . . . in the eyes of classical Islam."  Tr. 111:17–112:1, 131:21–132:6.

18. Indeed, NGE beliefs would likely not be accepted in a Jumu'ah service.  Tr. 131:11–132:3.  Moreover, NGE adherents generally do not regard the Qur'an as a "proof text" in the same manner as Muslims.  Tr. 154:1–4.  Likewise, to the extent NGE adherents "explore other religious traditions," including Islam, NGE adherents do so only "as long as [the adherent] understand[s] that [he is] the object of what they're talking about.  So if you are a Buddhist, then you are Buddha."  Tr. 147:24–148:5.

19. Some NGE adherents claim that NGE is not a religion.  Tr. 144:14–145:8.

20. For instance, the cover of the November 1995 issue of The Five Percenter magazine boldly displayed the headline, "WE ARE NOT A RELIGION."

7

Stirling's Ex. 2 at 1.  Included in that issue is an article with the same headline.  Id. at 2.  Beneath the headline reads "Should the Nation Seek 'Religion Status' (Recognition as a Religious Body)?  EMPHATICALLY NO!"[4]  Stirling's Ex. 2 at 2.

21. Dr. Knight testified that NGE adherents do not consider themselves as a religion in the sense that they do not believe in a supernatural god outside of themselves.  Tr. 145:11–16.  Indeed, many NGE adherents also describe NGE as a "culture" or "way of life."  Tr. 154:17–19.  Dr. Knight posited that many Christians, Muslims, and Buddhists sometimes similarly refer to their respective faiths as not being religions.  Tr. 145:11–146:14.

22. Dr. Knight provided various academic definitions of religion during his testimony.  Tr. 115:19–119:8.  In particular, he focused on a definition developed by Bruce Lincoln.  Tr. 116:3–119:8.  This definition looks at four domains: (1) transcendent discourse, (2) practices, (3) community, and (4) institutions.  Tr. 117:5–118:5.  Dr. Knight testified that all four of the domains are present within NGE.  Tr. 120:2–123:6.

23. As for transcendent discourse, the first domain, Dr. Knight acknowledged that NGE adherents do not worship a god outside of themselves, but he believes this domain is met through NGE adherents' use of the Supreme Mathematics

---

[4] The portion of this article that was admitted into evidence speaks of religion essentially as man's quest to have a relationship with one or more deities.  Stirling's Ex. 2 at 2.  It blames the "Euro-gentiles" for "deceiv[ing] the whole world, causing it to honor and worship false gods and idols, while at the same time giving an impression of their superior intelligence and culture."  Id.  It goes on to say that religion is not binding on NGE because NGE adherents do not wish to rely on anything other than themselves.  Id.

and Supreme Alphabets "as a way of working their creative powers as gods to make meaning in the world." Tr. 120:2–14.

24. As for practices, the second domain, Dr. Knight pointed again to NGE adherents' study of the Supreme Mathematics and Supreme Alphabets, as well as their dietary restrictions, and their meetings with co-religionists in a parliament. Tr. 120:15–121:17.

25. As for community, the third domain, Dr. Knight testified about how adherents of NGE view themselves as having a distinct tradition, history, culture, and communal identity. Tr. 121:18–122:4.

26. Finally, as for institutions, the fourth domain, Dr. Knight acknowledged that NGE does not have a hierarchical institution, such as the Roman Catholic Church. Tr. 122:5–9. However, he pointed to the fact that NGE does have the Allah School in Harlem, which is a center for Five Percenter thought. Tr. 122:10–17. He also pointed to the NGE idea of an "enlightener". Tr. 122:18–123:6. An NGE adherent's enlightener is the person who spreads knowledge to that adherent, and NGE adherents can trace the lineage of their enlightener back to a particular elder. Tr. 122:18:123.

**B.  SCDC's Policies Regarding Religion**

27. After the trial, a copy of the deposition of Chaplain Michael Cannon, SCDC's Rule 30(b)(6) witness, was admitted into the record. ECF No. 95. Chaplain Cannon has served as an SCDC Chaplain since 2008. Id. at 9:19–20. He testified regarding the process through which SCDC comes to officially recognize a faith. Id. at 28:8–33:18.

28. This process is dictated in Section 4 of SCDC's Inmate Religion Policy, PS-10.05 (the "Policy").  Stirling's Ex. 1 at 5–6.

29. According to Section 4.1 of SCDC's Policy, the official recognition process begins when an inmate makes a written request to the Chaplain.  Stirling's Ex. 1 at 5.  The Policy specifically describes what this written request must include:

> This request will include official written information about the beliefs of the faith and the practices that are requested, including meeting times, holy days, worship needs, religious education needs, religious symbols, and any special practices or observances that require physical participation or special equipment (such as baptism by immersion). Official recognition of a faith group will in part be contingent on whether there is a body of literature stating religious principles that support the practices and whether the practices are recognized by a group of persons who share common ethical, moral, or intellectual views.

Id.  Chaplain Cannon explained the inmate makes this written request by submitting it in a kiosk system.  ECF No. 95 at 28:25–29:21.

30. The Policy then states that "[t]he institutional Chaplain will meet with the inmate(s) who made the request and discuss all the information about the faith and its practices."  Stirling's Ex. 1 at 5.  If necessary, the Chaplain will require the inmate to fill out a "Religious Information Fact Sheet," which will include additional information about the inmate's religious practice.  Id.

31. According to Chaplain Cannon, the inmate cannot provide all of the information required by the Policy in his written request, and the inmate's meeting with the chaplain is therefore a necessary step in this process.  ECF No. 95 at 30:3–9.  He also explained that the inmate has no power to set up

10

the meeting with the Chaplain and that it is incumbent upon the Chaplain to set up the meeting with the inmate.  Id. at 30:3–13.

32. The Chaplin, in conference with the Warden, then submits a report to the Chief of Pastoral Care Services, who then makes a written recommendation to the Agency Director.  Stirling's Ex. 1 at 5.

33. During the trial, the court heard testimony from Chaplain Michael Brown ("Chaplain Brown"), who was formally SCDC's Chief of Pastoral Services.  Tr. 173:7–9.

34. Chaplain Brown testified that SCDC has limited time and space resources, which limits SCDC's ability to accommodate religious services.  Tr. 177:3–178:22.  He also explained that there are staffing limitations based on the number of chaplains available and the need to provide security.  Tr. 180:7–1810:16.

35. For this reason, SCDC brings groups of inmates together to provide communal religious services.  Tr. 177:13–178:22; Stirling's Ex. 1 at 4 ("When space is limited, faith groups which share common beliefs will be consolidated into a single meeting, and all participants will avoid sectarian or denominational teaching that is not included in the common belief.").  For instance, SCDC groups Protestant Christian inmates together rather than recognizing each individual Protestant denomination.  Tr. 177:13–178:22, 182:3–20.  SCDC provides Protestant Christian services for these inmates,

11

which focuses on "the central core of Christian beliefs."[5] Tr. 178:3–6; <u>see also</u> Stirling's Ex. 1 at 24–25 (describing the diversity within Protestantism, the common belief of Protestants, and how chaplains should organize Protestant worship services to focus on the common beliefs while rather than areas of disagreement).

36. Thus, SCDC officially recognizes seventeen "faith groups", but Chaplain Brown does not believe this encompasses the full diversity of beliefs among all inmates. Tr. 178:13–22. Chaplain Brown did not specifically list those seventeen faith groups in his testimony, but the court notes that the following faith groups are mentioned in SCDC's Handbook of Inmate Religious Practice (the "Handbook"): Al-Islam, Buddhism, Roman Catholicism, Protestant Christianity, House of Yahweh, Native American, Odinism/Asatru,[6] Rastafarian, Shetaut Neter, Unitarian Universalist, Wicca, World Deist Society, Hindusim, Judaism, Scientology, and Taoism.[7] <u>See generally</u> Stirling's Ex. 1 at 15–51.

---

[5] SCDC considers Roman Catholicism and Protestantism to be separate faith groups and provides separate services for these groups. <u>See</u> Tr. 177:18–25, 195:12–23; Stirling's Ex. 1 at 23–26. SCDC also appears to contemplate Christian Science, Jehovah's Witnesses, and Latter Day Saints (Mormons) as being within the Protestant umbrella but sufficiently unique to require separate study groups. Stirling's Ex. 1 at 26. However, since Chaplain Brown did not discuss this during his testimony, it is unclear whether SCDC is currently providing separate study groups for inmates of these faiths.

[6] During his testimony, Chaplain Brown acknowledged that SCDC recognizes Odinism as a faith group and that this faith group has historically been associated with white supremacy. Tr. 208:25–209:16.

[7] The court notes that this only comes to sixteen groups. It is possible, but not clear from SCDC's Handbook, that the seventeenth group is Eastern Orthodox Christianity. <u>See</u> Stirling's Ex. 1 at 23. SCDC recognizes Eastern Orthodox Christianity, Roman Catholicism, and Protestantism as the three "major divisions" of Christianity. <u>Id.</u> However, the Handbook goes on to explain that "the number of persons from [Eastern

37. Chaplain Brown described that SCDC has only one Muslim Chaplin, who has responsibility to supervise programing for SCDC's 1,500 Muslim inmates across twenty-one institutions.  Tr. 183:8–15.

38. Much like its approach to Protestant Christianity, SCDC treats Islam as a single faith group and holds Jumu'ah services based on the central beliefs of Islam.  Tr. 178:6–12, 182:21–184:1; Stirling's Ex. 1. at 16.  According to SCDC's Handbook, all Islamic Jumu'ah prayer services and sermons "must be from the essential beliefs of Islam, not from subjects where there are disagreements."  Stirling's Ex. 1 at 16.

39. The Handbook describes "Al-Islam" as "a faith directed by belief that there is but one God, Allah, and that Muhammad (p.b.u.h. [peace be upon him]) is the last prophet, and that the Qur'an (Koran) is Allah's revelation."  Stirling's Ex. 1 at 16.  It goes on to state what SCDC considers to be the common beliefs of Islam:

> There are seven essential doctrines about which all Muslims agree:
>
> - The belief in one God, Allah.
> - The belief in the angels of Allah.
> - The belief in the Books of Allah, which include the Torah, the Psalms, the Gospels of Jesus, and the Qur'an (Koran), as they were originally revealed.
> - The belief in the Messengers of Allah, which include Adam, Noah, Abraham, Moses, David, and Jesus, but Muhammad (p.b.u.h. . . . ) is considered the last prophet or messenger, or "seal of the prophets."

___

Orthodox Christianity] is very limited in the SCDC, and their needs will usually be met by participation in activities with other Christians, and/or by individual visits from ministers."  Id.  The court also notes that four of the recognized faith groups (Hinduism, Judaism, Scientology, and Taoism) had not been requested by any SCDC inmates as of the Handbook's 2015 edition.  Id. at 50.

- The Day of Judgment, where people will receive the reward (heaven) or punishment (hell) for their deeds on earth.
- Predestation or supremacy of Divine will.
- Life after death.

<u>Id.</u>

40. SCDC considers NGE as deriving from Islamic tradition and groups inmates adhering to NGE with those who adhere to Islam. Tr. 184:8–10.

41. Chaplain Brown explained that, while he was Chaplain at SCDC, he did research on the internet on NGE and determined that it was part of the same tradition as Islam. Tr. 192:20–194:12. However, he acknowledged that two different faiths can come out of the same tradition, much in the way Christianity is a separate faith from Judaism but arose out of that tradition. Tr. 194:18–23.

42. Chaplin Brown explained that an inmate whose faith group is not recognized may still practice his faith individually but may not participate in activities or religious programming in the chapel. Tr. 188:23–189:4. When asked to specifically explain the significance of official recognition, Chaplain Brown described it as "the measure by which we will allow and provide space and time for a faith stance." Tr. 188:12–13.

43. He also explained that, if a faith group is recognized, SCDC will try to accommodate religious services for that faith group but is not always able to do so. Tr. 200:3–5. Normally, SCDC will try to provide time and space for worship when three inmates in a particular institution from a particular

recognized faith group come forward with a request.[8]  Tr. 186:4–13; see also Stirling's Ex. 1 at 4 (SCDC policy requiring at least three inmates of a recognized faith group to schedule a study group or worship service).

44. SCDC's Policy also explains that "[a]lthough the goal when scheduling religious services will be to allow reasonable equal access to all faith groups, a Warden may limit the number of inmate participants in any religious activity for reason of safety and security."  Stirling's Ex. 1 at 4.

45. In addition, Chaplain Brown explained during his testimony, that when an inmate from a recognized faith group wants to deliver a sermon, the sermon must be pre-approved and is monitored by SCDC personnel for safety reasons. Tr. 213:5–21.

46. Only inmates from recognized faith groups are permitted to wear religious headgear.  Tr. 213:22–214:9.

**C. Incumaa's Background and Experience with NGE**

47. Incumaa is a prisoner who has been incarcerated by SCDC since 1989.  Tr. 12:9–17; see also Incumaa's Ex. 1 at 1.[9]

48. Incumaa was convicted of murder, kidnapping, and armed robbery and is serving a life sentence without the possibility of parole.  Tr. 12:21–25; Incumaa's Ex. 1 at 1.

---

[8] Chaplain Brown stated that he never received a request in his time at SCDC from any NGE adherents other than Incumaa.  Tr. 186:20–24.

[9] Plaintiff's Exhibit 1 is Incumaa's SCDC face sheet.  It indicates that Incumaa's admission date with SCDC was 1988.  Incumaa's Ex. 1 at 1.  During his trial testimony, Incumaa explained that he was housed in a county jail in 1988 and entered SCDC's custody in 1989.  Tr. 13:18–14:1.

49. Incumaa stated that, in his first couple of years in SCDC custody, he felt there was a void in his life, that he was in a "negative place" without guidance, and that this was causing him to "make some dumb decisions."  Tr. 16:9–18:6.

50. Incumaa first heard about NGE shortly after entering SCDC custody at the age of seventeen.  Tr. 15:19–17:12.

51. He described an encounter he had with another prisoner in the law library, which led to this other prisoner talking to him about NGE.  Tr. 16:9–17:9.

52. Incumaa stated that, in around 1994 or 1995, he started learning from other prisoners both about the law and about NGE.  Tr. 16:9–17:9.

53. Incumaa testified that, through this other inmate, he learned that NGE "is essentially built upon the principals of building your mind so that you can begin to think different from how you was thinking when you came in, and how to eat right, how to live right, and not how to get involved in things which are only going to drag you deeper into a hole."  Tr. 17:1–6.

54. Incumaa described that, through NGE, he began to think differently about his situation and about how to take personal responsibility.  Tr. 17:14–18:13.

55. Incumaa explained that, at the time, inmates at SCDC could work their way up to A Custody, which was a lower security level that permitted inmates to go out of their institution to work.  Tr. 19:6–13.  This was only available to inmates who had a lack of disciplinary actions against them and those who participated in educational and vocational programs.[10]  Tr. 19:14–25.

---

[10] Incumaa has participated in several such courses during his time in SCDC's custody.  See Incumaa's Ex. 2 (Incumaa's various certificates of achievement).

Incumaa testified that, as he spent more time learning about NGE, a lot of the inmates he was looking up to were those who became eligible for A Custody. 17:23–18:6.

56. In 1995, Incumaa was accused of being involved in a riot at Broad River Correctional Institution. Tr. 20:1–12.

57. After the riot, SCDC designated Five Percenters as a Security Threat Group ("STG"), and as a result, SCDC disallowed inmates from possessing NGE materials. See Tr. 22:4–10, 26:17–27:11.

58. Incumaa denies that he participated in the riot and testified that SCDC never brought disciplinary action against him based on his alleged involvement in the riot.[11] Tr. 20:3–17. While the state initially brought criminal charges against him for his alleged participation in the riot, those charges were ultimately dismissed and expunged from his record. Tr. 20:15–21:4.

59. Following the riot, SCDC placed Incumaa in a maximum-security unit at Kirkland Correctional. Tr. 21:5–22, 23:17–18; Incumaa's Ex. 1 at 4 (showing that Incumaa was transferred from Broad River Correctional to Kirkland Correctional on April 18, 1995).

60. Incumaa claims that SCDC had originally stated he was placed in the maximum-security unit because of his alleged participation in the riot but that

---

[11] Indeed, Incumaa has not had a single disciplinary sanction throughout his current period of incarceration. See Incumaa's Ex. 1 at 1.

17

they later told him it was because he refused to renounce NGE.[12]  Tr. 21:25–22:3.

61. In the maximum-security unit, Incumaa was locked in his cell in solitary confinement for twenty-three hours a day.  Tr. 23:2–13.

62. Incumaa had fully committed himself to NGE prior to entering solitary confinement, and it remained a vital part of his existence during that period.  Tr. 22:11–15, 25:4–12.

63. Prior to entering solitary confinement, Incumaa had possessed various NGE materials, but SCDC took those materials away, along with all his other property, when it placed him in solitary confinement.  Tr. 25:9–18.  Incumaa was permitted to access certain reading materials, such as the Bible, while in solitary confinement, but because SCDC had designated NGE as an STG, he was not permitted any NGE literature or materials.  See Tr. 25:20–26:16.

64. At around this same time, a group of SCDC inmates in administrative segregation filed a lawsuit to challenge SCDC's designation of Five Percenters as an STG.  See Tr. 22:4–10, 26:17–27:11; see also Mickle v. Moore (In re Long Term Admin. Segregation of Inmates Designated as Five Percenters), 174 F.3d 464 (4th Cir. 1999).

65. Incumaa testified that SCDC and the inmates in the administrative segregation lawsuit eventually reached a settlement agreement that permitted inmates to

---

[12] The Fourth Circuit has previously determined that, based on the record presented in that case, "no reasonable factfinder could conclude that [Incumaa's] renunciation of his faith is a prerequisite to returning to the general population."  Incumaa v. Stirling, 791 F.3d 517, 526 (4th Cir. 2015).

possess NGE materials but only when the inmates were in solitary confinement.  Tr. 26:7–28:11.

66. As a result, Incumaa was permitted access to NGE texts and was permitted to practice NGE alone in his cell.  Tr. 27:22–28:11.  He was not permitted to practice his religion with other inmates.  Tr. 28:4–7.

67. Incumaa credibly testified that, through study of his NGE materials, his outlook on life in solitary confinement was not misery.  Tr. 28:14–29:8.  He described taking comfort in NGE and learning, through NGE principles, about pointing his life "in a positive and productive direction."  Tr. 28:19–20.

68. Incumaa testified that SCDC told him he could leave solitary confinement if he signed papers renouncing NGE and revealing the criminal leadership of NGE.  Tr. 29:9–30:5.  Since Incumaa stated that the allegations of there being criminal leadership elements in NGE was untrue, he refused to sign the papers, and he instead stayed in solitary confinement for twenty-one years. Tr. 29:14–30:7.

69. Incumaa further testified that his time in solitary confinement led to mental health issues and that his faith in NGE helped him stay in touch with reality through his time in solitary confinement and his subsequent stay in a psychiatric hospital.  Tr. 29:14–30:7, 35:22–36:8.

70. Eventually, SCDC told Incumaa that he could go through a step-down program to get out of solitary confinement and back into the general population and that he would not have to sign the renunciation papers.  Tr.

37:22–39:9.  However, SCDC confiscated his NGE materials prior to his entering the step-down program.  Tr. 39:14–20.

71. In addition to telling the story of his personal development in NGE, Incumaa knowledgably described NGE, its tenets, and its origins.  Tr. 40:8–42:4.  This included aspects of the history of NGE and how he wished to have daily study of the Supreme Mathematics and Supreme Alphabets to discover deeper meaning and learn how to live.  Tr. 40:8–42:4, 67:25–74:19 (discussing his understanding of the difference NGE, NOI, and Islam).

72. Though Incumaa repeatedly referred to NGE as a "culture," he compared his use of this term to followers of Jesus stating that they follow "his way."  Tr. 40:9–41:10, 86:21–87:16.  Incumaa explained that the "culture" of NGE involves emulating the ways of Allah the Father.  Tr. 40:9–41:10.

73. Incumaa specifically explained that he considers himself to be an adherent of NGE and does not consider himself a Muslim.  Tr. 48:12–20, 54:10–16.

**D. Incumaa's Efforts at Exhaustion**

74. On May 23, 2016, after Incumaa returned to general population and SCDC took his NGE materials, Incumaa requested that SCDC recognize NGE as a faith and permit him to practice NGE in the general population.  Tr. 43:18–44:8.  He submitted this request via the prison kiosk system and it stated as follows:

> I REQUEST ACCOMMODATION TO PRACTICE MY FAITH , RELIGION, TE [sic] GOD CENTERED CULTURE OF ISLAM THAT IS THE NATION OF GODS AND EARTHS WITHIN THE GENERAL POPULATION OF SCDC.  THIS ACCOMMODATION IS PRESENTLY BEING AFFORDED TO PRISONERS IN THE U.S. FEDERAL BUREAU OF PRISONS AS

> WELL AS IN OTHER U.S. STATE DEPARTMENT OF CORRECTIONS. I EAGERLY AWAIT YOUR DISPOSITION.

Stirling's Ex. 16 at 1.

75. On June 21, 2016, Incumaa received the following response:

> Response to muslim inmates who request separate Shi'a, Sunni and other teachings the [sic] are against SCDC Policy (per chief chaplain) . . . The South Carolina Department of Corrections Inmate Religion Policy does not recognize separate Muslims sects or religion. The South Carolina Department of Corrections provides for one generic Muslim service and study group. There is no pressure from the SCDC staff for Muslim inmates to commit acts forbidden by their religion or from having a religious experience mandated by their faith . . . . The South Carolina Department of Corrections inmate Religion Policy indicates the use of a generic Muslim Jumu'ah service rather than separate services for (Sunni, Shia, Sufi, Lost-Found, NOI) etc. Sermons (Khutbahs) and teachings for the generic Muslim service must be from the essential beliefs of Islam, not from subjects where there are disagreements . . . . Any further concerns need to be sent to headquarter to Chief Chaplain Brown.

Stirling's Ex. 16 at 1. The last line directed Incumaa to contact Chaplain Brown if he had further concerns, and Chaplain Brown testified that he never received any communications from Incumaa. Tr. 189:15–190:2.

76. On June 28, 2016, Incumaa appealed the denial of his request for recognition by filing a Step 1 Grievance. Stirling's Ex. 17 at 1. His Step 1 Grievance stated:

> On 5-23-16, per SCDC Policy PS-10.05 Inmate Religion, sec. 4.1, I entered through the kiosk . . . a request for recognition and accommodation of my faith, the God Centered Culture of Islam that is the Nation of Gods and Earths in the general prison population of SCDC.

> My request was denied on 6/21/2016. I now appeal this denial.

Stirling's Ex. 17 at 1.

21

77. On July 13, 2016, the warden responded to Incumaa's Step 1 Grievance and said:

> Your grievance has been reviewed. You stated that you are being denied recognition and accommodation of your faith, the god Centered Culture of Islam that is the Nations of Gods and Earths in the general prison population of SCDC.
>
> Per Senior Muslim Chaplain, Adb'Liah Al-Ansuri, inmates have the choice to attend a "generic" service without being disruptive or to practice their faith individually. Inmates may also attend services provided by approved volunteers from their sect. SCDC Policy PS-10.05 "inmate Religion Handbook of Inmate Religious Practice" article 3 indicates that only "essential" agreed upon beliefs can be propagated in Islamic services within SCDC. SCDC Inmate Religious Policy does not recognize separate Muslim sects or religion. Your grievance is denied.
>
> If you are not satisfied with my decision, you may appeal to the appropriate responsible official within, (5) days of receipt, via the Institutional Grievance Coordinator.

Stirling's Ex. 17 at 2.

78. On July 18, 2016, Incumaa filed a Step 2 Grievance. Stirling's Ex. 17 at 3. It stated:

> I appeal because my faith, the God Centered Culture of Islam that is the Nation of Gods and Earths, is being denied recognition and accommodation within the general prison population of SCDC. I am being prohibited from practicing my faith individually. Further, to force me to attend a "generic" Islamic service, which is completely contrary, to the Islam of my faith, is to deny my faith and prohibit its exercise. The God Centered Culture of Islam that is the Nation of Gods and Earths, is not the same faith as the generic Islamic service being offered, which is in fact a Sunni Muslim Islamic service.

Stirling's Ex. 17 at 3.

79. SCDC denied Incumaa's Step 2 Grievance and stated:

> Your concern has been reviewed. I have reviewed your grievance. In your grievance your stated that on May 23, 2016, you submitted a request for recognition and accommodation of your faith, the God

22

Centered Culture of Islam that is the Nation of Gods and Earths in the general population of SCDC. You further stated that your request was denied on June 21, 2016. McCormick Correctional Institution is in compliance with SCDC Policy PS-10.05. Inmate Religion, Inmate Religion Handbook of Inmate Religious Practice, Al-Islam (Muslim) Article 3. You have been informed that your religious preference (God Centered Culture of Islam) is incorporated under the recognized religious preferences of Islam (Muslim) which disallows individual sects separate services. The Warden addressed your concerns appropriately on your SCDC 10-5 Step 1 Inmate Grievance Form.

Therefore, your grievance is denied.

Stirling's Ex. 17 at 3.

80. At no point during this process did anyone from the Chaplain's office contact Incumaa to ask him questions about NGE or what specifically he wanted to be recognized. Tr. 52:10–53:12, 65:6–23, 96:13–17.

### III.   CONCLUSIONS OF LAW

Before reaching the merits of Incumaa's claims, the court will begin with an examination into whether Incumaa properly exhausted his remedies.

### A.  Exhaustion

Under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), a prisoner may not bring an action under federal law with respect to his prison conditions until that prisoner first exhausts his available administrative remedies. The Supreme Court has upheld the plain language of the PLRA, holding that "Congress has mandated exhaustion clearly enough," Booth v. Churner, 532 U.S. 731, 741 (2001), and that the "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong," Porter v. Nussle, 534 U.S. 516, 532 (2002); accord Cutter v. Wilkinson, 544 U.S. 709, 723 n.12 (2005) ("State prison officials make the first judgment

23

about whether to provide a particular accommodation, for a prisoner may not sue under RLUIPA without first exhausting all available administrative remedies.").

Failure-to-exhaust is an affirmative defense, which must be raised and proven by the defendant. Custis v. Davis, 851 F.3d 358, 361 (4th Cir. 2017); see Anderson v. XYZ Corr. Health Servs., Inc., 407 F.3d 674, 681 (4th Cir. 2005). What is required for exhaustion is not set by the PLRA but is instead defined by the prison's grievance process. Jones v. Bock, 549 U.S. 199, 218 (2007). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" Id. This includes compliance with the prison's deadlines and critical procedural rules. See Woodford v. Ngo, 548 U.S. 81, 90–91 (2006).

Incumaa initiated the process of seeking official recognition for NGE when he filed his kiosk request on May 23, 2016. See Stirling's Ex. 16 at 1. However, this kiosk request arguably did not meet the procedural requirements set in SCDC's Policy regarding requests for recognition of faith groups. See id.; Stirling's Ex.1 at 5. For instance, Incumaa's request did not include information about NGE beliefs or practices, meeting times, holy days, symbols, or observances. See Stirling's Ex. 1 at 5; Stirling's Ex. 16 at 1. Thus, it is possible that this initial kiosk request was procedurally insufficient.

However, rather than addressing any of these possible technical deficiencies, SCDC's response to Incumaa's kiosk request stated that SCDC does not recognize individual sects of Islam and instead provides generic Muslim services on points of agreement. See Stirling's Ex. 16 at 1. In other words, SCDC denied Incumaa's request because it determined that NGE was a sect of Islam and not a separate faith group. See

id.  Likewise, SCDC's responses to Incumaa's Step 1 and Step 2 Grievances similarly did not mention any technical deficiencies in either Incumaa's initial request or his subsequent appeals.  See Stirling's Ex. 17 at 2, 3.  Instead, these responses, much like SCDC's initial response, denied Incumaa's request because SCDC does not recognize separate Muslim sects.  See id.  Thus, at every step of the process, SCDC denied Incumaa's request on the merits rather than because of any procedural deficiencies in his requests.

As both the Supreme Court and the Fourth Circuit have explained, the benefits of the PLRA exhaustion requirement include both allowing the prison to address and possibly resolve complaints on its own before being subjected to suit and improving litigation by encouraging the development of a useful factual record.  Jones, 549 U.S. at 219; Woodford, 548 U.S. at 89; Wilcox v. Brown, 877 F.3d 161, 167 n.4 (4th Cir. 2017).  When prison officials "forgo a rejection on procedural grounds and . . . elect to research, analyze, and deny a claim on the merits," the purposes of the exhaustion requirement are satisfied.  Rinaldi v. United States, 904 F.3d 257, 272 (3d Cir. 2018).

Beyond that, in deferring to prison officials to define what administrative procedures are required for a claim to be properly exhausted, see 42 U.S.C. § 1997e(a); Jones, 549 U.S. at 218, the exhaustion requirement protects a state's interests in setting its own grievance procedure, in reviewing a claim before suit is filed, and in enforcing its own rules, Reed-Bey v. Pramstaller, 603 F.3d 322, 325 (6th Cir. 2010); see also Ramirez v. Collier, 595 U.S. 411, 465 (2022) (Thomas, J., dissenting) ("If [a prisoner] had pursued administrative remedies properly, the State would have had a 'fair opportunity to consider [his] grievance.'" (first alteration in original) (quoting Woodford, 548 U.S. at

25

95)); <u>Cutter</u>, 544 U.S. at 723 n.12. Thus, when a prison chooses "to overlook or forgive its own procedural bar" by responding to the merits of a procedurally improper grievance, the court should not second guess that decision. <u>Reed-Bey</u>, 603 F.3d at 325. For these and similar reasons, every circuit to address the question, as far as the court can tell, has found that a prison waives the exhaustion defense when it rules on the merits of a prisoner's grievance rather than addressing procedural deficiencies in that grievance. <u>Rinaldi</u>, 904 F.3d at 272 & n.14; <u>Reyes v. Smith</u>, 810 F.3d 654, 657 (9th Cir. 2016); <u>Whatley v. Warden, Ware State Prison</u>, 802 F.3d 1205, 1215 (11th Cir. 2015); <u>Hammett v. Cofield</u>, 681 F.3d 945, 947–48 (8th Cir. 2012) (per curiam); <u>Maddox v. Love</u>, 655 F.3d 709, 721–22 (7th Cir. 2011); <u>Hill v. Curcione</u>, 657 F.3d 116, 125 (2d Cir. 2011); <u>Reed-Bey</u>, 603 F.3d at 324–25; <u>Ross v. Cnty. of Bernalillo</u>, 365 F.3d 1181, 1185–86 (10th Cir. 2004), <u>abrogated on other grounds by</u> <u>Jones</u>, 549 U.S. at 219–24; <u>accord</u> <u>Sosa v. Anderson</u>, 2018 WL 4677866, at *9 (N.D.W. Va. June 15, 2018) (finding that prison officials waived their exhaustion defense by considering a prisoner's grievances on the merits rather than rejecting them as untimely), <u>report and recommendation adopted</u>, 2018 WL 3584456 (N.D.W. Va. Jul. 26, 2018).

In following the examples set in these cases, the court is not going to second guess the SCDC officials' decision to forgive any procedural deficiencies in Incumaa's requests. The court finds that Incumaa's kiosk request was sufficient to put SCDC on notice of the merits of his claim—<u>i.e.</u>, that he was seeking recognition of NGE as a religion. <u>See</u> Stirling's Ex. 16 at 1; <u>see also</u> <u>Wilcox</u>, 877 F.3d at 167 n.4 ("[T]o satisfy the exhaustion requirement, grievances need only be sufficient to 'alert[ ] the prison to the nature of the wrong for which the redress is sought.'" (quoting <u>Strong v. David</u>, 297

26

F.3d 646, 650 (7th Cir. 2002)); <u>Reyes</u>, 810 F.3d at 659.  Consequently, because SCDC denied Incumaa's claim on the merits in its response to his initial kiosk request and at all subsequent steps in the grievance process, the court finds that Incumaa's claim is properly exhausted.  <u>See, e.g.</u>, <u>Rinaldi</u>, 904 F.3d at 272 & n.14; <u>Reed-Bey</u>, 603 F.3d at 325; <u>see also</u> <u>Sosa</u>, 2018 WL 4677866, at *9.

Additionally, to the extent Incumaa failed to exhaust his remedies by not communicating his request directly to the Chaplain, as required by the Policy, the court notes Chaplain Cannon's testimony that the meeting between the inmate and the Chaplain <u>cannot</u> be initiated by the inmate.  ECF No. 95 at 29:10–30:13.  It does not appear that anyone from the Chaplain's office ever contacted Incumaa to initiate this meeting or gather the necessary information.  Tr. at 52:10–53:12, 65:6–23, 96:13–17.  Therefore, to the extent speaking with the Chaplain was a step in the exhaustion process that Incumaa did not fulfill, the court finds that this was an unavailable administrative remedy.  <u>See</u> 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions . . . until such administrative remedies <u>as are available</u> are exhausted." (emphasis added)); <u>Ross v. Blake</u>, 578 U.S. 632, 642 (2016) ("[T]he exhaustion requirement hinges on the 'availab[ility]' of administrative remedies[.]"); <u>Moore v. Bennette</u>, 517 F.3d 717, 725 (4th Cir. 2008) ("[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it.").  The court, therefore, proceeds to the merits of Incumaa's RLUIPA claim.

### B.  RLUIPA

In general, RLUIPA protects a prisoner from laws or governmental practices that place a "substantial burden" on the prisoner's "religious exercise."  42 U.S.C. § 2000cc-

1(a).  In making a RLUIPA claim, the prisoner faces the initial burden of persuasion in making his prima facie case.  Id. § 2000cc-2(b).  That is, the prisoner must show that the challenged law or practice substantially burdens his religious exercise.  Id.  If the prisoner is able to do so, the burden shifts to the government to show that the challenged law or practice can overcome strict scrutiny—in other words, the government must prove that its law or practice "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  Id. §§ 2000cc-1(a), 2000cc-2(b).

### 1.  Incumaa's Prima Facie Case

The court begins by assessing whether Incumaa has met his initial burden of showing that SCDC's policies impose a "substantial burden" on his "religious exercise." Id. § 2000cc-1(a).  To do so, the court starts with the question of whether Incumaa's request for accommodation are based on "religious exercise."  After that, the court will address whether SCDC's policies impose a "substantial burden."

RLUIPA defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  Id. § 2000cc-5(7)(A). "Congress mandated that this concept 'be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution.'"  Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682, 696 (2014) (quoting § 2000cc-3(g)).  In other words, "Congress 'intended to provide as much protection as possible to prisoners' religious rights' without overly encumbering prison operations." Coward v. Robinson, 276 F. Supp. 3d 544, 566 (E.D. Va. 2017) (quoting Murphy v. Mo. Dep't of Corr., 372 F.3d 979, 987 (8th Cir. 2004)).

Courts determine whether an individual's beliefs are religious by looking at whether the beliefs are (1) sincerely held and (2) religious in nature.  Moore-King v. Cnty. of Chesterfield, 708 F.3d 560, 570–71 (4th Cir. 2013), abrogated on other grounds by Nat'l Inst. of Fam. & Life Advocs. v. Becerra, 585 U.S. 755, 767 (2018).  Beliefs are "religious in nature" when they "occupy a place in [the believer's] life 'parallel to that filled by the orthodox belief in God.'"  Id. at 571 (quoting United States v. Seeger, 380 U.S. 163, 166 (1965)).  However, belief in a deity is not a requirement for a set of beliefs to be considered religious.  See Tarcaso v. Watkins, 367 U.S. 488, 495 & n.11 (1961).  In approaching this question, courts must be careful not to put individuals "to the proof of their religious doctrines or beliefs."  United States v. Ballard, 322 U.S. 78, 86 (1944).

The court also bears in mind that, as the Supreme Court has cautioned, determining whether an individual's beliefs can be classified as religious is "a most delicate question."  Wisconsin v. Yoder, 406 U.S. 205, 215 (1972).  Yet it is one that must be answered because, in determining whether a particular set of beliefs merit protection, courts must distinguish religious beliefs from "[a] way of life," which "however virtuous and admirable, may not be interposed as a barrier to reasonable state regulation."  Id.; see also Holt v. Hobbs, 574 U.S. 352, 360–61 (2015) ("[O]f course, a prisoner's request for an accommodation must be sincerely based on a religious belief and not some other motivation.").

The court finds that Incumaa has met his burden of showing that his beliefs in NGE are both sincerely held and religious in nature.  Looking first to the sincerity of Incumaa's beliefs, the court finds that Incumaa credibly and knowledgably testified about NGE history, beliefs, and practices and about his desire to apply his studies of NGE texts

to his life.  Tr. 40:8–42:4, 67:25–74:19.  He testimony indicated his commitment to NGE

over the course of several decades in SCDC custody and specifically through the time he

spent in solitary confinement.  Tr. 22:11–15, 25:4–12, 29:9–30:7; see also Tr. 48:12–20,

54:10–16.  In short, there is ample evidence in the record to show that Incumaa's beliefs

are sincerely held, and the court has no reason to conclude otherwise.

    The court similarly finds that Incumaa's beliefs are religious in nature.  Dr.

Knight credibly testified about the history of NGE and its formation over time.  Tr.

111:17–113:12, 121:18–122:4, 124:15–128:18, 14:10–14.  Like how other faiths, such as

classical Islam, might study a sacred text to learn more about a deity, NGE adherents

generally study the Supreme Mathematics and the Supreme Alphabet on a daily basis to

grow in their faith and affirm their own godhood.   Tr. 114:1–115:6, 120:2–14.

Additionally, while NGE adherents may not be as organized as, for instance, the Roman

Catholic Church, Dr. Knight credibly described how their coming together to discuss

their faith amongst themselves is an important aspect of their faith.  Tr. 121:7–122:17.

These facts point to a finding of NGE beliefs being religious in nature.  See Emp. Div. v.

Smith, 494 U.S. 872, 877 (1990) ("[T]he 'exercise of religion' often involves not only

belief and profession but the performance of (or abstention from) physical acts:

assembling with others for a worship service, participating in sacramental use of bread

and wine, proselytizing, abstaining from certain foods or certain modes of

transportation."); Yoder, 406 U.S. at 216 (finding that the Amish traditional way of life is

religious, rather than a personal preference, because it involves deep convictions shared

by an organized group and "intimately related to daily living").  Additionally, while it is

true that some NGE adherents, including Incumaa, refer to NGE as being a "culture" and

specifically reject the label of a "religion," the court finds that there are those who adhere to both Christianity and classical Islam who have referred to their respective faiths in similar ways and that this label is not dispositive.  Tr. 40:8–41:10, 86:21–87:16, 144:14–146:14, 154:17–19.

In addition to these observations about NGE practices and traditions in a general sense, the court also notes the importance NGE has apparently played in Incumaa's life. As the court already discussed, Incumaa's testimony credibly points to the conclusion that he sincerely believes in the teachings of NGE.  Incumaa similarly explained that he wants to study NGE texts on a daily basis and be able to discuss NGE with other adherents.  Tr. 28:18–29:8, 40:8–42:4, 67:25–74:19.  Incumaa described how his beliefs in NGE had a positive impact on his life.  He explained that he was in a "negative place" before discovering NGE and that learning about NGE helped him avoid misery while he delt with the difficulty of being in solitary confinement for twenty-one years and then in a psychological institution.  Tr. 16:9–18:13, 28:14–30:7, 35:22–36:8.

The court finds that Incumaa's beliefs in NGE "occupy a place in [his] life 'parallel to that filled by the orthodox belief in God.'"  Moore-King, 708 F.3d at 571 (quoting Seeger, 380 U.S. at 166).  Because the court concludes that Incumaa's beliefs are both sincerely held and are religious in nature, the court finds that Incumaa has met his burden of showing that the accommodation he requests concerns his religious exercise.  See id.  The court must now determine whether SCDC's policies place a substantial burden on that exercise.

RLUIPA does not define "substantial burden," but courts understand that this requirement is satisfied "'when a state or local government, through act or omission, puts

substantial pressure on an adherent to modify his behavior and to violate his

beliefs.' . . . [A] government imposes a substantial burden on religious practice when it

puts a person 'between a rock and a hard place'—forcing them to choose between a

government-provided benefit and their religious convictions.'" Pendleton v. Jividen, 96

F.4th 652, 656 (4th Cir. 2024) (citation omitted) (first quoting Lovelace v. Lee, 472 F.3d

174, 187 (4th Cir. 2006); and then quoting Incumaa v. Stirling, 791 F.3d 517, 525 (4th

Cir. 2015)).

Because SCDC does not recognize NGE as a separate "faith group" from Islam,

NGE adherents are not permitted to reserve time for religious programing in the chapel.

Tr. 188:23–189:4. If NGE adherents wish to practice in a communal setting, SCDC

directs them to attend Muslim Jumu'ah services. See SCDC's Exs. 16 at 1; 17 at 2–3.

An inmate must attend at least 75% of the Jumu'ah services as a requirement for SCDC

to recognize an inmate as Muslim. Stirling's Ex. 1 at 17. SCDC policy dictates that

participants in a worship service must "avoid sectarian or denominational teaching that is

not included in the common belief." Stirling's Ex. 1 at 4; accord Tr. 177:13–178:22.

Thus, Jumu'ah services "must be from the essential beliefs of Islam, not from subjects

where there are disagreements," and SCDC considers belief in Allah as God, about

Muhammad being his last prophet, and about the Qu'ran being the true word of Allah as

being essential beliefs of Islam. Stirling's Ex. 1 at 16.

Although NGE may have been born out of Islam, the court finds that it has

transitioned into a different tradition (not unlike how Protestant Christianity emerged

from Roman Catholicism or how Christianity emerged from Judaism and formed separate

faith groups). See Tr. 129:1–130:19, 194:13–195:1. As both Incumaa and Dr. Knight

testified, NGE does not share many of the core beliefs SCDC attributes to all Muslims, most notably including the belief in one transcendent, external deity.  Tr. 74:25–78:3, 111:17–112:1, 113:8–21, 120:2–8, 131:21–132:6, 154:1–4, 165:8–14.    Rather, NGE adherents, including Incumaa, reject the idea of there being an external deity and worship themselves as gods, and Dr. Knight explained that many Muslims would likely consider this an extreme form of heresy.  Id.

Moreover, Incumaa and Dr. Knight both explained that part of NGE practice involves communal discussion and study with co-religionists.  Tr. 55:17–20, 121:6–17.  This is not uncommon and is considered an essential part of religious exercise for many different faiths.  See Smith, 494 U.S. at 877.  Thus, by failing to recognize NGE as a separate faith group, SCDC is forcing Incumaa to choose between having no communal religious experience, which would limit his ability to practice NGE, and attending Jumu'ah, where the teaching and discussion would likely focus on beliefs antithetical to NGE.  The court finds that this choice puts Incumaa between a "rock and a hard place" and that SCDC's failure to recognize NGE as a separate faith group is a substantial burden on Incumaa's religious exercise.[13]  See Pendleton, 96 F.4th at 656.

_____

[13] In a different case, a court in this district granted summary judgment in favor of SCDC after determining that SCDC's decision to not provide separate services and worship groups for NOI adherents does not impose a substantial burden on those prisoners' religious exercise.  Allen v. S.C. Dep't of Corr., 2012 WL 1655297, at *3–4 (D.S.C. April 24, 2012), report and recommendation adopted, 2012 WL 1655295 (D.S.C. May 10, 2012).  The court reached its conclusion after finding that the plaintiff had not met his burden of showing that the absence of NOI study groups violated a basic tenet of his religion and that the available Muslim study groups or Jumu'ah services did not "cause him to modify his behavior or to violate his beliefs."  Id.  For the reasons explained above, the record presented in this case constrains the court to reach a different result.  In other words, "[o]ther cases presenting different allegations and different records may lead to different conclusions."  Twitter, Inc. v. Taamneh, 598 U.S. 471, 507 (2023) (Jackson, J., concurring).

## 2. Strict Scrutiny

Having determined that Incumaa has shown SCDC is placing a substantial burden on his religious exercise, the court now moves to the second part of its inquiry and examines whether SCDC has shown that its policies are (1) in furtherance of a compelling governmental interest and (2) narrowly tailored to achieve that interest. 42 U.S.C. §§ 2000cc-1(a), 2000cc-2(b). Ultimately, the court finds that SCDC has met its burden on the first prong of this analysis but has failed to show that its policies are narrowly tailored.

As for SCDC's compelling governmental interest, Chaplain Brown testified about the limited space and staffing available for religious programing at SCDC and the need to manage those resources appropriately. Tr. 177:3–178:22. He also suggested that SCDC's policies are prompted by security concerns related to the need for security staff to transport inmates to the prison chapel and to monitor inmates while they participated in religious services.[14] See Tr. 177:3–178:22, 180:7–181:16, 213:5–16; see also Tr. 183:8–15.

The court is certainly cognizant of these concerns. See Cutter, 544 U.S. at 723 (explaining that Congress intended for RLUIPA to be applied with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources" (citation omitted)). In Allen v. South

---

[14] The court interprets this testimony as relating to SCDC's overall concerns regarding staffing resources and not about specific security threats posed by either Incumaa or NGE. Indeed, SCDC's designation of NGE as an STG is not at issue in this case. See Tr. 4:1–11:6; R&R at 30 n.17; ECF No. 46.

Carolina Department of Corrections, the court considered weather RLUIPA required

SCDC to permit separate Jumu'ah services and study groups for NOI adherents.  2012

WL 1655297 (D.S.C. April 24, 2012), report and recommendation adopted, 2012 WL

1655295 (D.S.C. May 10, 2012).  In that case, the court granted SCDC summary

judgment after finding, among other conclusions, that SCDC's policy of providing only

generic Islamic services was supported by compelling state interest related to "staffing

limitations and space constraints."  Id. at *5–6.  There is no reason to reach a different

conclusion on this issue based on the evidence presented in this case.  See id.; see also

Hassan v. Newhart, 2015 WL 139085, at *4 (E.D. Va. Jan. 9, 2015) (finding that

"maximizing limited prison resources" is a legitimate governmental interest), aff'd, 597

F. App'x 188 (4th Cir. 2015).  Therefore, the court finds that SCDC has met its burden of

showing that its challenged practices were prompted by compelling governmental

interests related to limited space and staffing resources.

That said, the court is not convinced that SCDC's failing to recognize NGE as a

faith group is the most narrowly tailored means of dealing with its space and staffing

limitations.  "'The least-restrictive-means standard is exceptionally demanding,' and it

requires the government to 'sho[w] that it lacks other means of achieving its desired goal

without imposing a substantial burden on the exercise of religion by the objecting

part[y].'"  Holt, 574 U.S. at 364–65 (quoting Burwell v. Hobby Lobby Stores, Inc., 573

U.S. 682, 728 (2014)).  Even for faith groups that are recognized, SCDC's policies

already have other mechanisms in place for dealing with its concerns.  For example,

SCDC's Policy dictates that a faith group may only schedule time for a group study or

worship service when at least three inmates from a given institution so request.  Stirling's

Ex. 1 at 4.  Chaplain Brown similarly testified that SCDC tries to accommodate requests from those of different recognized faith groups but that it is not always able to do so due to its constraints.  Tr. 188:23–189:4, 200:3–5.

In addition to managing staffing resources directly related to providing religious services, Chaplain Brown also testified to legitimate concerns regarding how recognition of NGE might stretch limited staffing resources related to inmate safety.  Tr. 177:3–178:22, 180:7–181:16; see also Tr. 183:8–15.  Even so, SCDC's policies specifically permit limitations on its ability to accommodate religious activities when such accommodations are necessary to ensure safety.  Stirling's Ex. 1 at 4.  Thus, even if SCDC were to recognize NGE as a separate faith group, there would still be restrictions in place for SCDC to address the concerns espoused by Chaplain Brown regarding limited resources and safety.

As such, the court finds that SCDC has not carried its burden of proving that its practice of not recognizing NGE as a separate faith group is narrowly tailored to achieve its compelling governmental interest.  Accordingly, the court finds that RLUIPA requires SCDC to recognize NGE as a separate faith group.

Before concluding, the court would be remiss if it did not pause to clarify what exactly it is holding and to comment on the narrowness of its decision today.  As previously explained, when Incumaa initially brought this case, he challenged not only SCDC's failure to recognize NGE as a faith group but also several specific ways he contended SCDC was burdening his religious exercise.  Compl. § IV.D.   This included claims based on SCDC's alleged denial of various accommodations, such as accommodations of Incumaa's NGE dietary restrictions, permitting Incumaa to wear

36

religious headgear, permitting Incumaa to observe NGE holy days, and permitting Incumaa to possess NGE literature in the general population.  Id.

During the trial, both Incumaa and Chaplain Brown testified on Incumaa's lack of access to NGE literature and his inability to discuss NGE with other prisoners while in the general population.  Tr. 54:10–21, 207:14–208:22.  However, upon reviewing this testimony, it seems that these restrictions are likely based on SCDC's designation of NGE as an STG rather than SCDC's failure to recognize NGE as a faith group.  See id.  As the magistrate judge noted in the R&R, and as the parties confirmed at the onset of trial, Incumaa is not challenging SCDC's designation of NGE as an STG in this case.  Tr. 4:1–11:6; R&R at 30 n.17; ECF No. 46.  Therefore, to the extent these restrictions stem from SCDC's designation of NGE as an STG, the court takes no position on these issues.  On the other hand, to the extent these restrictions stem from SCDC not recognizing NGE as a faith group, these practices may need to be reassessed in light of the court's decision.  See Coward, 276 F. Supp. 3d at 571 ("[A] zero tolerance policy is by definition a maximally restrictive, minimally tolerant policy."); cf. Mickle, 174 F.3d at 470 (finding that designating Five Percenters as STG did not deprive them of other their ability to exercise their religion because, "[a]lthough the inmates are unable to participate in group meetings,they [sic] are not 'deprived of all means of expression.'" (quoting O'Lone v. Est. of Shabazz, 482 U.S. 342, 352 (1987)).

Relatedly, the court has already granted summary judgment in favor of SCDC on Incumaa's other specific requests for accommodation, and those issues are also not currently before the court.  See ECF No. 46.  The court notes, however, that SCDC appears to predicate some of its decisions regarding religious accommodations on

whether the requesting inmate belongs to a recognized faith group.  For instance, an inmate is only permitted to wear religious headgear if he is part of a recognized faith group.  Tr. 213:22–214:9.  Similarly, SCDC also appears to base its religious dietary accommodations, at least in part, on whether a particular inmate belongs to a recognized faith group.  See, e.g., Stirling's Ex. 1 at 8 (requiring the availability of a vegetarian "Alternative Entree Diet" that "will meet the meat restrictions requirement of all <u>faith groups</u>" (emphasis added)), 18 (describing the special meals that will be made available to inmates recognized as Muslim), 22 ("Some Buddhists are vegetarian and can choose the Alternate Entree Diet.").  <u>But see id.</u> at 26 ("If a Seventh Day Adventist inmate requests a pork-free diet, they can be approved to receive the Alternative Entree Diet on the days pork is served.  The Chaplain will verify the membership of the inmate by contracting a community minister of that faith.").[15]

If, in the future, an inmate were to seek similar accommodations of NGE beliefs or practices, the court does not presume to substitute its judgment for that of SCDC in deciding how those requests should be resolved.  See Woodford, 548 U.S. at 89 (explaining that the purpose of exhaustion is to give an agency the authority to decide matters for itself before being "haled into federal court" (quoting McKart v. United States, 395 U.S. 185, 193 (1969)); Reed-Bey, 603 F.3d at 325 (explaining the state's interest in receiving and reviewing prisoner grievances); see also Stirling's Ex. 1 at 5. Instead, the court trusts that, in light of its decision today, SCDC will approach such

---

[15] It is not clear whether SCDC recognizes Seventh Day Adventists as a separate faith group from Protestant Christianity, but it does appear that SCDC recognizes Seventh Day Adventists as having need for separate dietary accommodations.  See Stirling's Ex. 1 at 26.

accommodation requests in recognition of NGE's status as a faith group and will act accordingly within the bounds of the law and its policies regarding religion.

## IV.   CONCLUSION

Based on the foregoing, the court finds that Incumaa has properly exhausted his claim regarding recognition of NGE and has shown that RLUIPA requires SCDC to recognize NGE as a separate faith group.  Accordingly, it is **ORDERED** that a judgment be entered against Stirling reflecting the same.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**September 30, 2024**
**Charleston, South Carolina**